FILED
2015 Aug-17  PM 02:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **RUBY J., individually and as mother and next friend of L.L., a minor,** } | |
| } | |
| **Plaintiff,** } | |
| } | **Case No.:  2:14-cv-00581-RDP** |
| **v.** } | |
| } | |
| **JEFFERSON COUNTY BOARD OF EDUCATION,** } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on two motions:  (1) Defendant's Renewed Motion for Judgment on the Record (Doc. 42), filed February 24, 2015; and (2) Plaintiff's Renewed Motion for Judgment on Plaintiffs' IDEA Appeal and Motion for Summary Judgment on Plaintiffs' Rehabilitation Act Claims (Doc. 44), filed February 24, 2015.  The parties have fully briefed their Motions (Docs. 43, 45, 49, 50), and the United States intervened in this case pursuant to 28 U.S.C. § 2403(a).  (Doc. 46).  Plaintiff Ruby J., individually and as mother and next friend to her daughter L.L., a minor, asserts claims against the Jefferson County Board of Education pursuant to section 504 the Rehabilitation Act, 29 U.S.C. § 794, and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*  Plaintiff appeals from an administrative due process hearing decision which concluded that Defendant satisfied its obligations under the IDEA.  (Doc. 1).

After carefully reviewing the record and considering the arguments made by the parties, and for the reasons stated below, the court concludes that the Hearing Officer's decision on

Plaintiff's IDEA claims is due to be affirmed and Defendant is entitled to summary judgment on Plaintiff's section 504 claims.

## I.      Facts

L.L. is a thirteen-year-old student who has several serious disabilities, including Angelman's Syndrome (a rare genetic disorder), Reactive Airway Disease, a seizure disorder (including febrile, petit mal, and grand mal seizures), and Cystic Cerebromalacia. (R. 25-26, 417-418).[1]  Surgeries to reconstruct L.L.'s airway damaged her vocal chords, she uses a wheelchair for mobility, and L.L. has a G-tube through which she receives nutrition.  (R 25-26, 417-18).  Plaintiff is a single parent and the primary caretaker of L.L.  As her mother, Plaintiff is responsible for L.L., including caring for her by administering some of her medications.  (R. 24-27, 90).

L.L. was expected to experience increased seizure activity as she aged.  Therefore, in the summer of 2012, L.L.'s treating physician, Dr. Lauree Jones, prescribed her Diastat to help control her seizure activity.[2]  L.L. needed to have Diastat available while being transported for trips in excess of ten minutes.[3]  (R. 25-26, 107-08, 507-08).  Although Diastat is typically administered by a nurse or other health care provider, Dr. Jan Mathisen, L.L.'s treating neurologist, discussed with Plaintiff how to administer Diastat to L.L. in case of an emergency.  (R. 25-26, 98-99).  Dr. Mathisen felt that no physical demonstration was necessary; rather, he referred Plaintiff to certain websites for a visual demonstration.  (R. 99).

---

[1] "R." refers to the administrative record, as filed by Defendant with the court under seal.

[2] Fortunately, L.L.'s seizures appear relatively infrequent.  L.L. has not had a seizure while enrolled in Jefferson County schools, and, at the time of this appeal was filed, the last seizure L.L. experienced was at an amusement park when she lived in California.  (R. 153-54).

[3] Diastat is a medication that is rectally administered to help control seizures lasting longer than five minutes.  (R. 26).

### A.    Plaintiff's First Enrollment with Defendant

On December 17, 2012, Plaintiff first registered her daughter at the Clay-Chalkville Middle School in the Jefferson County School District.  (R. 24-25, 28-29, 503).  That is the school for which L.L. was zoned.  (*Id.*).  L.L. transferred to Jefferson County from the Birmingham City System.  (R. 221-22).[4]   On December 20, 2012, Defendant held an individual education program ("IEP") meeting for L.L., and with Plaintiff's knowledge and agreement, L.L. was placed at the Burkett Center, a school which exclusively educates children with disabilities. (R. 29, 503).  L.L. began attending school on January 3, 2013.  (R. 222, 227).

It has never been disputed that, as a child with a qualifying disability, L.L. is entitled to some form of specialized transportation under the IDEA.  This was necessary in the event that she experienced a prolonged seizure that would require the administration of Diastat.  At the request of the Burkett Center staff, Plaintiff provided Defendant with Dr. Jones's prescription confirming L.L.'s need for specialized transportation.  (R. 227-28, 503).  Because Defendant indicated that it had no nurse to accompany L.L. on the bus, Plaintiff agreed to transport her daughter to the Burkett School.[5]   The Burkett Center is located in Morris, Alabama, which is about twenty miles from Plaintiff's home.  Plaintiff contends that it takes about forty-five minutes to transport L.L. to school one way, even assuming minimal traffic.  (R. 40, 397, 403-05).  Defendant asserts that the trip takes thirty-four minutes.  (R. 534).[6]   In any event, Defendant reimbursed Plaintiff on the basis of its standard mileage reimbursement plan (R. 236-37), and

---

[4] While in Birmingham City schools, L.L. was transported to and from school by Plaintiff without objection on the basis of "monthly reimbursement for a.m. and p.m. pick up at current mileage rate."  (R. 226-27).  Plaintiff had previously entered into reimbursement contracts with every school system in which L.L. had been enrolled, including Jefferson County.  (R. 226-27, 266, 500, 229-36).

[5] Defendant has presented evidence suggesting that Plaintiff informed school personnel that she would not administer the Diastat suppository gel. (R. 155, 387, 448, 106).  Plaintiff disputes that assertion.

[6] Although Plaintiff contested Defendant's mileage calculation at the due process hearing, she has explicitly abandoned this claim on this appeal.  (Doc. 45, at 12 n.6).

Plaintiff received no other compensation.  (R. 35-36, 44-45).  Plaintiff does not challenge this initial arrangement.

In January 2013, Plaintiff provided the school with a prescription from L.L.'s physician advising that, for bus trips longer than ten minutes, a nurse should be on the bus with L.L. to respond to a seizure.  (R. 227, 507).  Shortly thereafter, Defendant employed a nurse for that purpose.  (R. 249-50).  On March 8, 2013, four days after this nurse reported for duty (R. 247-48), L.L. was withdrawn from Jefferson County schools.  (R. 272).

**B.      Plaintiff's Yuba County, California Enrollment**

In late February 2013, Plaintiff and her children moved to California to care for Plaintiff's seriously ill mother.  On April 8, 2013, a month after Plaintiff's withdrawal from Jefferson County schools, Plaintiff completed enrollment papers for L.L. in California.   (R. 272).  On June 3, 2013, L.L. began receiving educational services in California.  (R. 245, 272-73).  The school term ended on June 11, 2013.  (R. 272).

On July 1, 2013, the Yuba County School District held an IEP meeting for L.L., and developed an IEP that acknowledged L.L.'s need for specialized transportation.  (R. 465).  L.L.'s transportation needs were addressed as follows:

> In her prior IEP, transportation was provided by the parent with in lieu reimbursement.  The IEP indicated the parent had a note from [L.L.'s] physician stating a nurse was needed for transportation on the bus that was more than ten minutes long. [Plaintiff] is in the process of establishing doctors in this area and will provide a note us when given by the Doctor. . . .
>
> The offer of FAPE for [L.L.] is continued placement in the YCOE SDC Developmental Center with Specialized Academic Instruction for 325 min/day for 5x/week; Specialized Nursing Services 325 min/day for 5x/week; *Specialized transportation provided for PLUSD by MJUSD once doctors note is provided regarding nurse required on bus (parent will continue to transport at this time);* ESY services as listed;  Supplemental Aides and Services as listed.

(R. 480) (emphasis supplied).  Yuba County agreed to provide a nurse on L.L.'s bus once it received the appropriate documentation from L.L.'s doctor; however, in the interim, L.L.'s IEP clearly reflects that Plaintiff agreed to transport L.L. to and from school for reimbursement. (R. 300, 475, 480).

### C.   Plaintiff's Second Enrollment with Jefferson County

On August 10, 2013, shortly before the start of the 2013-14 school year, L.L.'s family moved back to Alabama prior to the beginning of the 2013-14 school year, and returned to the same home they previously occupied in the Clay-Chalkville school zone.  (R. 113-16).  The heart of this dispute is the nearly two months after that (between August 27, 2013, and October 24, 2013), during which Plaintiff was responsible for her daughter's transportation.  (R. 43-45, 391-92).

Plaintiff claims she was initially unsuccessful in contacting the school's administration to set up L.L.'s program for the next school year. (R. 28-31, 116-17).  Plaintiff alleges that she attempted to contact Defendant "prior to school starting" on August 19, and again on August 21 and 22.   (R. 116:6-11).   Plaintiff also asserts she contacted the Exceptional Education Department several times, but was only given Special Education Director Susan Wirt's voicemail.  (R. 116).

Nevertheless, on August 23, 2013, Defendant directed Plaintiff to enroll L.L. directly at the Burkett Center.  (R. 29-32, 37-38, 117-19, 268-70, 391).  Defendant contends that Plaintiff was allowed to enroll L.L. directly to simplify and facilitate delivery of special education services.  (R. 31-32, 267-269, 454, 437).[7]  When Defendant told Plaintiff to place her daughter at the Burkett Center it did not yet have L.L.'s IEP from Yuba County (the "Yuba County IEP"),

---

[7] Defendant also contends that Plaintiff would have otherwise been required under applicable regulations to enroll L.L. at Clay-Chalkville as a regular middle school student pending completion of an initial evaluation.

which was dated July 1, 2013.  Plaintiff told Dan Roth, the Burkett Center's principal, that she was no longer able to transport L.L. to the Burkett Center.  (R. 119-21).  She asked that Defendant to transport her daughter.  (R. 119-21).  Roth told Plaintiff that, because Defendant didn't have the necessary transportation set up yet, Plaintiff would have to temporarily transport her daughter to school.  (R. 122, 249-51, 256-59).  Because L.L. was deemed an out-of-state transfer, Defendant believed it was not required to immediately hold an IEP meeting to address Plaintiff's inability to continue transporting her daughter.  (R. 85, 207-08, 267-68, 270, 279).  Roth told Plaintiff that her request for bus transportation with medical support would be considered at a board meeting on September 24, 2013.[8]  (R. 122).  Accordingly, Plaintiff began transporting L.L.  (R. 40-42, 89-90).

Plaintiff's first day of school at the Burkett Center was August 27, 2013.  (*See* R. 549).  Each day Plaintiff waited until her younger children boarded their bus before taking L.L. to school, and she picked L.L. up early from the Burkett Center to make sure that she could arrive back in time for her younger children's return home.  (R. 39-41, 89-90).  This routine caused L.L. to be fifteen to thirty minutes late each morning, and required her to leave fifteen to thirty minutes early each afternoon.[9]  (R. 39-42, 89-90, 162-68, 180).  Thus, Plaintiff's responsibilities to her other children caused L.L. to miss a "full" school day.  (R. 41-42, 127, 180).  However,

---

[8] Although Jefferson County has the ability to contract with private nurses, salaries may not be paid until a position is created and approved by the school board.

[9] The record reveals that L.L. typically arrives at school at 8:15 a.m., fifteen minutes after the start of the instructional day.  (R. 162, 151-52).  Plaintiff picked her daughter up between 2:15 and 2:20 p.m. and school was dismissed between 2:45 and 2:50 p.m.  However, students had quiet time (which started at 2:35 p.m.) to prepare for departure.  (R. 165-66).  Plaintiff's other children arrived home between 3:30 and 4:00 p.m. each day.  (R. 95 (Plaintiff noting that typically the bus dropped her kids off closer to 4:00 p.m.)).

Plaintiff and Defendant came to an agreement that L.L.'s absence would not be counted against her.[10]  (R. 41-42, 127, 180).

In addition, the parties dispute whether Plaintiff was told that she had to accompany her daughter on field trips.  Plaintiff alleges that Jefferson County told Plaintiff that if she did not accompany L.L. during off-campus activities, including L.L.'s adaptive physical education class and other community based activities, L.L. could not attend these events. (R. 45-49, 77-78, 129, 174, 177-78, 392).  Defendant has offered testimony from Rob Dawson, an Exceptional Education teacher at the Burkett Center, which, Defendant argues, undermines Plaintiff's assertion entirely.[11]  (*See* R. 159-61).

On September 23, 2013, Defendant received L.L.'s IEP from Yuba County.  (R. 263, 465).  In compliance with Burkett Center's protocol, Defendant requested an updated letter from Plaintiff's physician regarding Plaintiff's continued need for specialized transportation.[12]  On September 25, 2013, Dr. Jones provided a letter with her recommendations in which she specified that "[L.L.'s] medical condition requires that she be accompanied by a registered nurse (RN) when riding the school bus." (R. 50-51, 138, 389).  On October 7, 2013, Defendant posted an

---

[10] In Alabama, attendance policies for schools differ from school system to school system, but the Alabama State Board of Education adopts standards for a mandatory and enforceable attendance policy for all students in public schools in the State.  Ala. Code § 16-28-2.1.  Parents can be held accountable for the failure of their child to attend school under these policies.  *Id.*

[11] Defendant suggests that Dawson's testimony at the December 9, 2013 due process hearing supports its contention that L.L.'s participation in extracurricular activities was never conditioned on Plaintiff's attendance or transportation:

> Q.   What were the circumstances under which [Plaintiff] attended [one of the field trips]?  Did she come of her own volition?  Did you tell her if she didn't come that [L.L.] couldn't go, or was there a conversation about that?
>
> A.   Oh, no.  I'm sure I asked her if she could go.  I never told [Plaintiff] or any of my parents that they had to do anything.  No.

(R. 160).

[12] The Burkett Center's enrollment protocol requires students to provide current (*i.e.*, annually updated) medical directives and orders. (R. 50, 189-90).

7

initial advertisement for an RN (pursuant to Dr. Jones's recommendation), but the advertisement produced no applicants for the position.  (R. 257-58).  Wirt personally contacted L.L.'s physician to determine whether an LPN could meet L.L.'s transportation needs.  (R. 258).  When Dr. Jones agreed that an LPN would be sufficient (R. 390), a qualified LPN was hired and has accompanied L.L. on the bus since that date.   (R. 261-62).

As the school system was attempting to secure a nurse to meet her physician's request, Wirt attempted to contractually reimburse Plaintiff for transporting L.L. to and from school.  (R. 251-52).  Defendant had done this during Plaintiff's first enrollment.  (*Id.*).  Wirt explained the need for a written contract (R. 394), which was only a temporary measure until the nurse could be hired.  (R. 247-48).   Although Plaintiff initially agreed to enter into the contract, Plaintiff ultimately declined to sign the contract that Defendant sent her on September 24, 2013.  (R. 394-95, 450-51).   On October 8, 2013, Plaintiff wrote Ms. Wirt declining to honor Defendant's request for her signature on the transportation reimbursement contract.  (R. 397).  Plaintiff stated that it was not her responsibility to transport her daughter to and from school.  (*Id.*).  In addition, Plaintiff's letter requests hourly wages ($10 per hour) for transporting her daughter — in addition to the reimbursement that the school offered.  (*Id.*).  Plaintiff also requested that the school provide her daughter with compensatory education to make up for the time L.L. missed school when Plaintiff brought her in late and checked her out early on school days.  (R. 398). Lastly, Plaintiff expressed her concern that her daughter might not be getting the services she needs since she did not have a current IEP.  (*Id.*).

On October 11, 2013, Defendant held a meeting with Plaintiff for the purpose of referring L.L. for special education services.  (R. 62-64, 66-67, 140-41).   During this meeting Debra Scruggs, a Special Education Supervisor, told Plaintiff that unless Plaintiff executed the

transportation reimbursement contract, Defendant would not reimburse Plaintiff for mileage. (*Id.*). On October 14, 2013, Plaintiff wrote to Wirt. (R. 399-400). Plaintiff indicated that she believed the Defendant miscalculated the mileage to the Burkett Center from her house. (R. 399). Plaintiff also reiterated her demand for hourly wages in transporting her daughter to and from the school every day, as well as on school field trips. (R. 399).

On October 17, 2013, Wirt again informed Plaintiff that she could not be reimbursed for her mileage without an executed contractual agreement to support the payment. Also, Wirt indicated the nursing position would be approved on October 24, 2013. (R. 262). At the end of October, Plaintiff notified Defendant several times that L.L. was going to miss school because Plaintiff's car was broken down or because Plaintiff did not have enough money for gas. (R. 56, 67-68, 78-79, 275, 392, 396, 401, 406-08).[13]

On October 24, 2013 -- two days after Plaintiff filed her due process hearing request -- Wirt told Plaintiff that Defendant would provide bus transportation for L.L. with medical support. (R. 261-62). On the same day, Jefferson County sent Plaintiff a progress report which stated that L.L.'s "infrequent attendance has negatively impacted L.L.'s performance with [her sensory activities] goal" and with her "self-help skills, health" goal. (R. 81-82, 178, 409-12). On October 25, 2013, bus transportation began for L.L. (R. 82-83). On November 6, 2013, Plaintiff began working outside the home. (R. 89). That same day, Defendant developed L.L.'s new IEP, which included bus transportation with medical support as a related service. (R. 83-84, 417-19, 429).

---

[13] On two of these days, Plaintiff stated the reason that she could not transport L.L. was due to problems with her vehicle. (R. 407-08). However, as Defendant has demonstrated Plaintiff had a secondary vehicle, and she has not provided any explanation as to why she could not have transported L.L. to school using it. (R. 90, 93).

## II.     Procedural Background

On October 22, 2013, Plaintiff filed a due process hearing request with the State Superintendent of Education.   (R. 307).   In her request, Plaintiff alleged that Defendant wrongfully denied Plaintiff's request for specialized transportation.  (*Id.*).  On December 9, 2013, a hearing was held before Wesley Romine (the "Hearing Officer"), in Birmingham, Alabama. (R. 1, 307).   At the hearing, Plaintiff requested compensatory education, reimbursement for mileage, and hourly wages for taking her daughter to school each day between August 27, 2013, and October 24, 2013.  (R. 12-13, 366).   On January 30, 2014, the Hearing Officer issued his decision, finding Plaintiff was not entitled to any compensation or other relief because her daughter was appropriately provided services under the IDEA without any procedural violations. (R. 542-58).  Following this decision, Plaintiff timely filed an appeal to this court along with a claim under section 504 of the Rehabilitation Act.  (Doc. 1).

## III.    Standard of Review

In this case, two standards of review apply.  With respect to Plaintiff's IDEA claim, the district court's review is in the nature of an appeal, but it is not limited to the administrative record.  *Weiss v. Sch. Bd. of Hillsborough County*, 141 F.3d 990, 992 (11th Cir. 1998).  In the IDEA context, an administrative decision in an IDEA case "is entitled to due weight and the court must be careful not to substitute its judgment" for that of the hearing officer.  *Walker Cnty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000), citing *Jefferson Cnty. Bd. of Educ. v. Ala. Dep't of Educ.*, 853 F.2d 853 (11th Cir. 1988); *Doe v. Ala. Dep't of Educ.*, 915 F.2d 651 (11th Cir. 1990).[14]  Nevertheless, the Eleventh Circuit has made clear that "the extent of the deference to be given to the administrative decision is left to the sound discretion of

---

[14] The judicial review provision in the IDEA "deviates from the familiar 'substantial evidence' standard for review of administrative decisions." *Escambia Cnty. Bd. of Educ. v. Benton*, 406 F. Supp. 2d 1248, 1256-57 (S.D. Ala. 2005), quoting *Walker*, 203 F.3d at 1297.

the district court which must consider the administrative findings but is free to accept or reject them." *Walker Cnty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297-98 (11th Cir. 2000); *see also Doe v. Ala. State Dep't of Educ.*, 915 F.2d 651, 657 n.3 (11th Cir. 1990) (same). "Courts owe some judicial deference to local administrative agency judgments, though that's typically limited to matters calling upon educational expertise." *Loren F.*, 349 F.3d at 1314 (citation omitted). The court reviews legal conclusions by the hearing officer under a *de novo* standard. *Draper*, 518 F.3d at 1284.

With respect to Plaintiff's section 504 claim, the court reviews the parties' motions for summary judgment pursuant to the familiar Federal Rule of Civil Procedure 56(c). Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

If the moving party bears the burden of proof at trial, it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact (*i.e.*, facts that would entitle it to a directed verdict if not controverted at trial). *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial, but does not require evidence negating the nonmovant's claim; it simply requires the movant to show that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16.

If the movant meets its initial burden by using this second method, the nonmoving party may either rely on evidence in the record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence that is sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.    Discussion

After careful review, and for the reasons outlined below, the court concludes that Plaintiff cannot sustain her claims under either the IDEA or section 504 of the Rehabilitation Act.[15]

### A.      Plaintiff's IDEA Appeal

On this appeal, Plaintiff challenges the Hearing Officer's January 30, 2014, decision, finding that Defendant satisfied its obligations to L.L. by offering her services in accordance with her existing Yuba County IEP without procedural violations.   After review, the court affirms both the Hearing Officer's factual findings and conclusions of law.

---

[15] In this case, the United States intervened for the limited purpose of defending the constitutionality of the IDEA.  (Doc. 46 at 1).  Because the court concludes that Plaintiff's IDEA appeal is due to be denied and that Defendant is entitled to summary judgment on Plaintiff's Rehabilitation Act claim, the court finds it unnecessary to address Defendant's constitutional defenses.  Nevertheless, to the extent a determination on Defendant's immunity issues is necessary, the court concludes that Defendant is not entitled to immunity. Even if Defendant were deemed to be an "arm of the State," the State of Alabama has waived any immunity that it could otherwise claim by accepting federal funding under the IDEA. 20 U.S.C. § 1403(a) (A "State shall not be immune under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter."); *see, e.g., Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 274 (5th Cir.) (en banc) (by accepting federal IDEA funds Louisiana validly waived immunity), *cert. denied*, 546 U.S. 933 (2005); *A.W. v. Jersey City Pub. Sch.*, 341 F.3d 234, 238 (3d Cir. 2003) (New Jersey similarly waived its immunity); *M.A. v. State-Operated Sch. Dist. of City of Newark*, 344 F.3d 335, 338 (3d Cir. 2003) (same); *Board of Educ. of Oak Park & River Forest High Sch. Dist. No. 200 v. Kelly E.*, 207 F.3d 931, 935 (7th Cir.) (Illinois similarly waived its immunity), *cert. denied*, 531 U.S. 824 (2000); *Bradley v. Arkansas Dep't of Educ.*, 189 F.3d 745, 753 (8th Cir. 1999), *vacated in part on reh'g en banc*, 235 F.3d 1079 (8th Cir. 2000), *cert. denied*, 533 U.S. 949 (2001).

1.      **IDEA Governing Standards**

When the IDEA, 20 U.S.C. §§ 1400 *et seq.*,[16] first became law, "the majority of disabled children in America were either totally excluded from schools or sitting idly in regular classrooms awaiting the time when they were old enough to drop out." *Schaffer* v. *Weast*, 546 U.S. 49, 52 (2005) (internal quotation marks omitted) (quoting H.R. Rep. No. 332, 94th Cong., 1st Sess. 2 (1975)).  With the passage of the IDEA and its predecessor statutes, Congress sought to "reverse this history of neglect," *Schaffer*, 546 U.S. at 52, by ensuring "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs," 20 U.S.C. § 1400(d)(1)(A).

The IDEA is "frequently described as a model of 'cooperative federalism.' " *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005) (quoting *Little Rock School Dist. v. Mauney*, 183 F.3d 816, 830 (8th Cir. 1999)).  The IDEA provides federal grants to States "to assist them to provide special education and related services to children with disabilities." 20 U.S.C. § 1411(a)(1).  The IDEA "leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, [but] imposes significant requirements to be followed in the discharge of that responsibility." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005) (quoting *Bd. of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 183 (1982)).  In order to receive the federal IDEA funds, a State must ensure that a free appropriate public education ("FAPE") designed to meet the child's unique needs is made available to every eligible child with a disability residing within the State

---

[16] Congress first passed the IDEA in 1970 as part of the Education of the Handicapped Act, Pub. L. No. 91-230, 84 Stat. 175.  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51-52 (2005).  It was substantially amended by the Education for All Handicapped Children Act of 1975, Pub. L. No. 94-142, 89 Stat. 773, and became known as the IDEA in 1990, Pub.L. 101–476, 104 Stat. 1142.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 n.6 (2009).

between the ages of three and twenty-one, based on a State's mandated age range. 20 U.S.C. §§

1412(a)(1), (4)-(5).  The IDEA defines a FAPE as "special education and related services" that:

>  (A)   have been provided at public expense, under public supervision and
>  direction, and without charge;
>
>  (B)   meet the standards of the State educational agency;
>
>  (C)   include an appropriate preschool, elementary, or secondary school
>  education in the State involved; and
>
>  (D)   are provided in conformity with the individualized education program
>  required under section 1414(d) . . . .

20 U.S.C. § 1401(9). To provide a FAPE, a school formulates an IEP during a meeting between

the student's parents and school officials. *See* 20 U.S.C. § 1414(d)(1)(A)-(B); *Loren F. ex rel.*

*Fisher v. Atl. Indep. Sch. Sys.*, 349 F.3d 1309, 1312 (11th Cir. 2003); *see generally M.M. ex rel.*

*C.M. v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 437 F.3d 1085, 1095-96 (11th Cir. 2006) (detailing

the IEP process).  Notably, "[t]he FAPE described in an IEP need not be the best possible

one . . . rather, it need only be an education that is specifically designed to meet the child's

unique needs, supported by services that will permit him to benefit from the instruction." *Loren*

*F.*, 349 F.3d at 1312 n.1 (quoting *Pace v. Bogalusa City Sch. Bd.*, 325 F.3d 609, 618-19 (5th Cir.

2003)).

In addition, the IDEA requires that when a State accepts IDEA funds, it must comply

with detailed procedural requirements, which include review of individual complaints regarding

the IDEA's substantive requirements in administrative due process hearings. 20 U.S.C. §§

1412(a)(6), 1415(f); *see also Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458

U.S. 176, 179 (1982) (noting the IDEA predecessor statute "conditions such funding upon a

State's compliance with extensive goals and procedures").  In Alabama, a due process hearing is

conducted by an impartial due process hearing officer appointed by the State Superintendent of

Education.   Ala. Admin. Code r. 290-8-9-.08(8)(c)2.   A party who does not prevail at the impartial due process hearing has a right to judicial review of a FAPE determination in a federal district court. 20 U.S.C. § 1415(i)(2)-(3).

> ### 2.       FAPE Analysis

The court addresses Plaintiff's appeal within the framework of the Supreme Court's two-part test for analyzing whether a FAPE was provided in IDEA cases.   Under this analysis, the court must determine whether: (1) Defendant complied with the procedures set forth in the IDEA, and (2) the IEP developed is reasonably calculated to enable the child to receive educational benefit.   *K.C.*, 285 F.3d at 982 (citing *Rowley*, 458 U.S. at 206-07).   "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."   *Rowley*, 458 U.S. at 207.

> #### (a)       Defendant Complied with the Procedures Set Forth in the IDEA

On appeal, Plaintiff argues that two procedural defects caused L.L. to be denied a FAPE. According to Plaintiff, Defendant did not provide proper notice regarding its decision to deny Plaintiff's request for transportation as a related service and did not appropriately consult Plaintiff regarding the provision of "comparable services" under the Yuba County IEP.   (*See* Doc. 45, at 30, 37).   The court disagrees.   The record reflects that no procedural defects occurred in this case.   But even if a procedural defect did occur (and, again, to be clear, it did not), there was simply no harm that would entitle Plaintiff to relief.   The court addresses each of these conclusions, in turn.

Plaintiff argues that Defendant failed to comply with the IDEA's notice provisions by failing to formally notice Plaintiff of its refusal to transport L.L. from August 23, 2013, to October 25, 2013.   To be sure, federal regulations require that school systems provide formal written notice of intent to parents a reasonable time before the district proposes or refuses to

initiate or change the identification, evaluation or educational placement of the child or the provision of FAPE to the child. 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503.  But, as the Hearing Officer correctly observed, "In this case the school system never refused to provide the related service of transportation (with medical support)."  (R. 554).  The record on appeal plainly supports the Hearing Officer's factual finding.  (*See, e.g.*, R. 122 (Plaintiff testified that, on or around August 27, 2013, Roth told Plaintiff that she "would have to transport [L.L.] *temporarily* because . . . of course, they didn't have bus transportation set up yet." (emphasis added)).[17]

As Defendant sought to secure transportation in accordance with Plaintiff's request, Defendant offered Plaintiff an interim arrangement.  And Plaintiff's own testimony reflects this interim offer was not a rejection.  (R. 122).  Rather, the offer was an accommodation that, at a minimum, satisfied Defendant's obligations under Plaintiff's operative Yuba County IEP. Therefore, because Defendant never rejected Plaintiff's request for additional services, the notice requirement was never triggered and no procedural violation occurred.

Plaintiff also contends L.L.'s entitlement to a FAPE was compromised because she was not given the opportunity to consult with Defendant regarding the provision of comparable services under her Yuba County IEP.   A school system receiving an out-of-state transfer must generally provide services comparable to the student's pre-existing IEP until a new evaluation can be conducted to determine eligibility.   20 U.S.C. § 1414(d)(2)(C)(i)(II); 34 C.F.R. § 300.323(f); Ala. Admin. Code r. 290-8-9-.05(10)(b). Both state and federal regulations require

---

[17] The Hearing Officer was required to assess conflicting evidence in at least this respect: Plaintiff claims she received a phone call from a nurse associated with Defendant, on September 25, 2013.  In that call, Plaintiff contends that Defendant "denied" her request for a nurse because L.L.'s doctor's confirmation expired.  (R. 50-51). Yet, Defendant asserts that in the same phone call, the nurse requested doctor's confirmation for her requested services.  Soon after Plaintiff provided this confirmation, Defendant approved and hired a nurse.  (R. 261-62).  This evidence does not undermine the Hearing Officer's decision that Defendant never denied Plaintiff's request for transportation as a related service.  Nor does this call alter the court's conclusion that Defendant offered services in accordance with the Yuba County IEP, which contained the same precondition to bus transportation with medical support — a doctor's note.  (R. 480).

that schools provide these services "in consultation with the parents."    20 U.S.C. § 1414(d)(2)(C)(i)(II); 34 C.F.R. § 300.323(f); Ala. Admin. Code r. 290-8-9-.05(10)(b).

To be sure, the IDEA is very deferential to parents of children with disabilities, and with very good reason.  Nevertheless, the following facts contained in the record are not lost on the court.  First, the Yuba County IEP was not prepared and finalized until July 2013.  (R. 465, 480). Prior to that, there was about a one-month gap between the time Plaintiff withdrew L.L. from school in Jefferson County, Alabama and the date she completed enrollment papers for her school in California.  (R. 272).  The record reflects that it was another couple of months before L.L. began receiving educational services in California.[18]  (R. 245, 272-73).

Plaintiff returned to Alabama on August 10, 2013, just as school was about to start for that academic year.  (R. 113-16).  Plaintiff claims that she tried to contact the school system on August 19, 21, and 22 about L.L., but had difficulty speaking with an official at Jefferson County about re-enrolling L.L.  (R. 28-31, 115-17).  The record does not reflect that Plaintiff made any attempt to contact Jefferson County before her move.  (This may not be required under the IDEA, but it could have expedited the delivery of services to L.L.).  In any event, Plaintiff actually communicated with the school system on August 23 (four days after she began her efforts).  (R. 29-32, 37-38, 117-19, 268-70, 391).  Jefferson County expedited L.L.'s enrollment at the Burkett Center in order to quickly facilitate the delivery of special education services.  The record also reflects that when Plaintiff informed Dan Roth, the Burkett Center's principal, that she could no longer transport L.L. to school, Roth started the process of having that service approved and hiring the required personnel (who were not then available).  Again, L.L. was an out-of-state transfer and Jefferson County did not yet have the Yuba County IEP or an updated

---

[18] In fact, L.L. began receiving educational services in California on June 3, 2013, but the school year ended on June 11, 2013.  (R. 272).

letter from L.L.'s physician. The school agreed to reimburse Plaintiff for transporting L.L. during the interim between her enrollment of L.L. and the hiring of the person(s) needed to provide the service. (R. 251-52). In light of these facts, the court cannot say Defendant violated the IDEA.

In this case, however, a review of the record indicates that (1) Defendant provided transportation as a related service "in consultation with" Plaintiff, and (2) Plaintiff had actual notice of every decision with respect to L.L.'s transportation.[19] This is not to say that Plaintiff was always satisfied with the manner in which her specialized transportation requests were fulfilled — she clearly was not. But Plaintiff's dissatisfaction with the product of her consultation with Defendant does not render that consultation procedurally defective. Moreover, and alternatively, even if Defendant failed to perfectly comply with the IDEA's notice and consultation requirements (which, to be clear, it did not), the record plainly reflects that any such procedural defect did not result in the denial of a FAPE.

To begin with, not every procedural defect results in a violation of a FAPE. Rather, "[i]n evaluating whether a procedural defect has deprived a student of a FAPE, the court must

---

[19] Upon Plaintiff's return to Alabama from California, and after receiving Plaintiff's request for bus transportation with medical support, Roth asked Plaintiff to temporarily transport her daughter to school until Defendant was able to provide her bus transportation with medical support. (R. 121-22, 249-51, 256-59). Furthermore, at the parties' initial start of school meeting, Plaintiff and Defendant discussed how Plaintiff's responsibilities to her other children would affect L.L.'s attendance, and Plaintiff and Defendant came to an agreement that, due to her situation, L.L.'s tardiness and early departures would not be counted against her. (R. 41-42, 127, 180). Wirt, Defendant's Special Education Director, and Plaintiff regularly communicated as Defendant attempted to reimburse Plaintiff for her transportation cost under the interim arrangement. (R. 247-48, 262). Although Defendant contends that Plaintiff initially agreed to enter into the contract, Plaintiff wrote Wirt on October 8, 2013 and October 14, 2013, formally declining Defendant's request for her signature on the transportation reimbursement contract, indicating that she believed the Defendant miscalculated the mileage to the Burkett Center from her house, and demanding hourly wages for transporting her daughter to and from the school every day, as well as on school field trips. (R. 397-400). Moreover, on October 11, 2013, Defendant held a meeting with Plaintiff regarding L.L.'s referral for special education services, during which Debra Scruggs, a Special Education Supervisor, told Plaintiff that unless Plaintiff executed the transportation reimbursement contract, Defendant would not reimburse Plaintiff for mileage. (R. 62-64, 66-67, 140-41). Accordingly, the record plainly shows that Plaintiff communicated in writing, in person, and on the phone with Defendant regarding the provision of transportation services to L.L. throughout the relevant time period in this case.

consider the impact of the procedural defect, and not merely the defect *per se*." *G.J. v. Muscogee County Sch. Dist.*, 668 F.3d 1258, 1270 (11th Cir. 2012) (quoting *Weiss*, 141 F.3d at 994); *see also Doe*, 915 F.2d at 661-63 (holding deficiencies failing to impact parental involvement were not sufficient to warrant relief).

In considering the impact of the procedural defect alleged here, the court looks to whether it resulted in harm to the child and whether it thwarted the purpose of the procedural requirement. *Weiss*, 141 F.3d at 996-97; *DeKalb Cnty. Sch. Dist. v. J.M.*, No. 1:06-CV-125-TCB, 2008 WL 8429694, at *5 (N.D. Ga. Sept. 3, 2008), *aff'd*, 329 F. App'x 906 (11th Cir. 2009) ("[T]o succeed on a procedural challenge, W.M. must show that harm flowed from the procedural violations . . .  To do this, W.M. must show that the procedural violations resulted in a failure to provide an educational benefit or restricted the ability of the parents to participate fully in their child's education." (citation omitted)).   The purpose of the IDEA's notice and consultation requirements is to ensure "full participation of concerned parties throughout the development of the IEP."  *Doe*, 915 F.2d at 661-63 (quoting *Rowley*, 458 U.S. at 205-06); *see also Honig v. Doe*, 484 U.S. 305, 311 (1988) ("Congress repeatedly emphasized throughout the [IDEA] the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness."); *Loren F.*, 349 F.3d at 1313 n.2 ("Parental involvement in the handicapped child's education is the purpose of many of the IDEA's procedural requirements."); *M.M.*, 437 F.3d at 1095-96 (same).

The court concludes that the record establishes that Defendant "consulted" with Plaintiff throughout the process, and Plaintiff fully and effectively participated in all decisions related to the provision of L.L.'s specialized transportation.   Despite any alleged procedural defect, Plaintiff was a full participant in the process, and the deficiencies (at least from Plaintiff's

perspective) -- including a delay in Defendant's provision of medically supervised bus transportation -- cannot be said to have resulted from any procedural defect of notice or consultation.[20]   Accordingly, Plaintiff's objections regarding Defendant's alleged procedural defects are overruled.

> **(b)     The Yuba County IEP is Reasonably Calculated to Enable L.L. to Receive an Educational Benefit.**

In the second step of the court's FAPE analysis, the court must address the sufficiency of Defendant's special education services provided under L.L.'s IEP.  This inquiry calls upon the court to ask whether the IEP is reasonably calculated to enable the child to receive educational benefit. *See K.C.*, 285 F.3d at 982.  The Hearing Officer concluded that Defendant satisfied its IDEA obligations to L.L. by offering the same services contemplated by the Yuba County IEP. (R. 553-54).   Plaintiff contends that the Hearing Officer's decision violated the IDEA's substantive mandates because: (1) Defendant had the obligation to transport L.L.; (2) L.L.'s transportation denied her a full day of education; and (3) L.L.'s transportation was not "free." For the reasons outlined below, the court concludes that the Hearing Officer's decision comports with the IDEA's substantive requirements.

> **(1)     Defendant Satisfied Its Obligation to Transport L.L.**

The gravamen of Plaintiff's grievance is that Defendant unlawfully denied Plaintiff a FAPE because L.L. did not receive the "related service" of transportation.  (Doc. 45, at 20).[21]

---

[20] A review of Defendant's compliance with the IDEA's substantive requirements, below, further confirms that L.L. did not suffer harm from any of the alleged procedural defects.

[21] Plaintiff also argues that Defendant denied a FAPE by "forcing" Plaintiff to accompany L.L. to any of her extracurricular activities.  (Doc. 45, at 3).  The IDEA requires that students with disabilities be provided an equal opportunity to participate in extracurricular and nonacademic activities. 34 C.F.R. 300.107; 20 U.S.C. § 1412(a)(1); Ala. Admin. Code r. 290-8-9.07(3).  Defendant satisfied this specific obligation to provide transportation services in the same manner it satisfied its more general obligation to provide transportation as a related service by offering Plaintiff mileage reimbursement until it could provide a medical support for L.L.'s bus transportation.  And, as discussed below, Plaintiff was not forced to provide these transportation services; she voluntarily agreed to

Defendant does not dispute that, under the IDEA, L.L. was generally entitled to the specialized transportation as a "related service."  *See* 20 U.S.C. § 1401(9), (26)(A); 34 C.F.R. § 34(a). Rather, Defendant contends that it fulfilled its obligation to provide specialized transportation to L.L. by providing transportation services comparable to those offered under her existing Yuba County IEP, while at the same time pursuing bus transportation with medical support.

Both state and federal law help define Defendant's obligations to children with disabilities that transfer from out-of-state schools with existing IEPs.   20 U.S.C. § 1414(d)(2)(C)(i)(II); 34 C.F.R. § 300.323(f); Ala. Admin. Code r. 290-8-9-.05(10)(b).   Under Alabama regulations implementing the IDEA, a school district must provide an eligible child with a FAPE, including services comparable to those described in the previously held IEP, until a new evaluation is conducted and eligibility is determined.   Ala. Admin. Code r. 290-8-9-.05(10)(b).  Accordingly, when L.L. enrolled in Jefferson County schools, Defendant had a duty to provide L.L. with a FAPE, including services "comparable" to those described under her existing Yuba County IEP.

After a due process hearing and briefing on the matter, the Hearing Officer determined that Defendant satisfied its IDEA obligations to L.L. because "an examination of [the Yuba County IEP] revealed that the child was offered the *same transportation services* when she re-enrolled in the Jefferson County School System as she was receiving in California."  (R. 552) (emphasis added).   The Hearing Officer determined that the related transportation services provided under the Yuba County IEP and those offered by Defendant were "the same."   The court concludes that this finding is both correct and, in any event, due deference because it is certainly supported by sufficient evidence.

---

*temporarily* provide them as part of a sensible solution to allow Defendant the opportunity to schedule school-provided transportation with medical support to L.L.

Under the Yuba County IEP, dated July 1, 2013, Plaintiff agreed to transport L.L. for reimbursement until Plaintiff had the opportunity to establish doctors in California who could confirm that bus transportation with medical support was necessary and appropriate.  (R. 480).  Plaintiff has never asserted that she did not voluntarily enter into this agreement.[22]  Less than two months later, after school had started, L.L. re-enrolled in Jefferson County schools and Defendant offered Plaintiff a transportation services contract that provided mileage reimbursement as a temporary measure until medical support for L.L.'s bus transportation could be provided.  (R. 122, 251-52, 395).[23]  Although Plaintiff agreed to transport her daughter, she refused to execute the reimbursement contract.  (R. 397-400).

On appeal, Plaintiff claims that Defendant's offer was not "comparable" because the Yuba County IEP made explicit that Plaintiff's transportation of L.L. would last only until Plaintiff had the opportunity to establish doctors in California who could confirm that bus transportation with medical support was appropriate.  (*See* R. 480).  The Hearing Officer did not find this distinction meaningful.  (R. 553).  Neither does this court.  Plaintiff's own testimony belies her assertion that Defendant did not intend to for Plaintiff's transportation of L.L. to be temporary.  (R. 122) (Plaintiff testifying that, during or around L.L.'s re-enrollment, Roth, the Burkett Center principal, told Plaintiff that she "would have to transport [L.L.] *temporarily* because . . . of course, they didn't have bus transportation set up yet.").[24]  There is sufficient

---

[22] Plaintiff's voluntary agreement to provide transportation services for mileage reimbursement is one of the primary distinctions between this case and those instances where parents are "forced" to participate in the provision of services to their child.  *See, e.g., In re Montgomery County Public Schools*, 504 IDELR 228 (SEA Md. 1982) ("[T]he provision of special education and related services to the child may not be conditioned on whether or not the parent participates in one of the related services.").

[23] In fact, this was the same reimbursement arrangement that Plaintiff accepted the previous year during her first enrollment in Jefferson County, except the dates were changed.  (R. 252).

[24] Contrary to Plaintiff's assertion, Defendant's request for an updated doctor's confirmation (just like the one contemplated by the Yuba County IEP (*see* R. 480) did not undermine the "comparability" of Defendant's offer.

evidence in the record which supports the Hearing Officer's factual finding that Defendant offered Plaintiff comparable -- if not identical -- services to those provided under L.L.'s Yuba County IEP.

Moreover, the court cannot ignore the fact that the comparable services offered under the Yuba County IEP were merely a temporary accommodation provided while Defendant secured the additional transportation services Plaintiff requested (*i.e.*, bus transportation with medical support).  (*See* R. 122).  It is hardly surprising that school districts may not always be able to immediately correct an inappropriate IEP, and that some delay may be expected depending on the type of services requested and the complexity of the problem to be accommodated.

Here, the court affirms the Hearing Officer's factual finding that prior to Defendant's receipt of the Yuba County IEP, "the special education director was actively trying to engage a nurse to accompany [L.L.] on the school bus." (R. 554).  Defendant was delayed in providing Plaintiff's requested services due to difficulties obtaining the Yuba County IEP, the resignation of several of Defendant's nurses, and a lack of applicants for the slated position.  (R. 553-54). Defendant also worked through various challenges in its efforts to secure nursing services for L.L.  In total, Defendant was able to provide bus transportation with medical support to L.L. within sixty-two days after her enrollment, thirty-one days after Defendant obtained the Yuba County IEP, and twenty-nine days after Plaintiff provided Defendant with doctor's confirmation that the specialized transportation was still appropriate.  Throughout the process, Defendant made repeated attempts to provide comparable services under Plaintiff's Yuba County IEP in the

---

It may be true that, as Plaintiff suggests, Defendant had Plaintiff's 2012 doctor's confirmation on file.  However, circumstances change, and it was not unreasonable for Defendant, in accordance with its stated policy, to require annual documentation to support a parent's request for services.

form of mileage reimbursement.  (R. 397-400).  Defendant's behavior was clearly reasonable.[25]

Accordingly, Plaintiff has failed to establish that Defendant did not provide L.L. transportation

as a related service.

### (2)    L.L.'s Transportation Did Not Deny L.L. a Full Day of Education.

Plaintiff challenges the Hearing Officer's decision insofar as Plaintiff believes it

sanctions an IEP which would deprive L.L. a full day of instruction.   Alabama's rules

implementing the IDEA require that children with disabilities receive a full day of educational

programming unless the IEP team specifies a different length of time based on the individual

needs of the child.  Ala. Admin. Code r. 290-8-9-.05(2)(c); *see also* 20 U.S.C. § 1401(9)(B); 34

C.F.R. § 300.11(c)(2).

In this case, Plaintiff's contention that L.L. was denied a full day's education is

disingenuous.  As the Hearing Officer determined, "the ultimate responsibility to ensure that a

child attends school is on the parent."  (R. 556) (citing for example truancy laws, Ala. Code § 16-

28-12).  To the extent that the IDEA shifted this responsibility and mandated that the school

provide transportation as a related service, *see* 20 U.S.C.  § 1401(26)(A), Defendant offered

Plaintiff a transportation services conforming to her then-operative Yuba County IEP.   Under

this arrangement, Plaintiff's own preferences and priorities determined L.L.'s arrival and

departure times.[26]  Accordingly, the court declines Plaintiff's invitation to apply the IDEA in a

---

[25] Indeed, had Defendant decided to conduct an initial evaluation when L.L. enrolled to determine what services were necessary (as it was entitled to do under Alabama regulations), Plaintiff might not have received specialized transportation services for up to ninety days.  Ala. Admin. Code r. 290-8-9-.02(1)(b) (public agency has sixty days to complete initial evaluation and thirty days thereafter to determine initial eligibility); *see also* Ala. Admin. Code r. 290-8-9-.04(1).  Instead, the record reveals that Defendant expedited Plaintiff's enrollment and provision of services by permitting Plaintiff to directly enroll in the Burkett Center and also by providing a menu of special education services even before Defendant could obtain the Yuba County IEP.  (R. 31-32, 267-269, 454, 437).

[26] The court agrees with and affirms the Hearing Officer's conclusion that "[t]he same rational applies to the late enrollment of [L.L.] for the 2013-2014 school year.  Timely enrolling a child in school is the responsibility of the parent — not the school system." (R. 556).

way that would place liability on a school district for a parent's inability to fulfill the obligations which the IDEA permit a parent to assume. *Cf. Loren F.*, 349 F.3d at 1312 (parents' remedies under IDEA may be limited even in absence of FAPE if parents' actions frustrated school's efforts to provide same); *Doe*, 915 F.2d at 663 (no procedural violation where delay in formulating IEP was caused by child's parents); *Escambia Cnty. Bd. of Educ. v. Benton*, 406 F. Supp. 2d 1248, 1276 (S.D. Ala. 2005); *E.D. ex rel. Dukes v. Enterprise City Bd. of Educ.*, 273 F. Supp. 2d 1252, 1267-68 (M.D. Ala. 2003) (a delay in implementation of new IEP that was at least partially attributable to child's parents does not violate of procedural requirements of IDEA).[27]

### (3)    L.L.'s Related Transportation Service Was Provided at No Cost to Plaintiff.

Plaintiff next argues that the Hearing Officer's decision is contrary to the IDEA's requirement that L.L. receive free related services because there were costs associated with Plaintiff's transportation of L.L. and Defendant did not offer to cover those. As discussed above, under the IDEA, an eligible child with disabilities is entitled to the "free" related service of transportation. 20 U.S.C. § 1401(26)(A). Generally, the IDEA requires that services be free if they are "provided at public expense, under public supervision and direction, and without charge." 20 U.S.C. § 1401(9)(A). Accordingly, free services are those provided at no cost to the parent. *See Letter to Anonymous*, 20 IDELR 1155, 1155 (OSEP Oct. 8, 1993) ("In order to

---

[27] In addition, the record undermines several of Plaintiff's excuses for not being able to get her daughter to school. Plaintiff claims that several of L.L.'s absences and delays were caused by unavoidable "car trouble," (*i.e.*, Plaintiff's car being broken down and Plaintiff not having enough money for gas). (*See, e.g.*, R. 56, 67-68, 78-79, 275, 392, 396, 401, 406-08). However, Plaintiff admitted that she had another operable vehicle available (R. 90, 93), and has offered no explanation as to why she could not have used this vehicle to transport L.L. when the other car was inoperable. Moreover, by failing to sign Defendant's reimbursement contract, Plaintiff effectively deprived herself of funds that she could have used for gas and repairs, and those would have enabled L.L.'s more consistent attendance. The court has no trouble concluding that Plaintiff's own decisions, priorities, and preferences led to her inability to get her daughter to school. Therefore, it was Plaintiff -- not the Hearing Officer or Defendant -- who disregarded the IDEA's guarantee of a full day of instruction.

qualify as 'free' . . . special education and related services must be provided at *no cost to parents*." (emphasis added)); *see also, e.g.*, *Richardson Indep. Sch. Dist. v. Michael Z*, 580 F.3d 286, 298 (5th Cir. 2009) ("Department of Education regulations provide that '[i]f placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at *no cost to the parents of the child*.'" (emphasis added)).  For the following reasons, the court concludes that Plaintiff's argument lacks merit.  Defendant's offer of services contemplated reimbursing Plaintiff for all the costs arising from L.L.'s transportation.

First, Plaintiff has not identified any cost associated with L.L.'s transportation that Defendant's reimbursement offer would not cover.  Defendant provided Plaintiff the school's standard reimbursement contract based on the IRS's 2013 standard business mileage reimbursement rate, which would have provided her 56.5 cents per mile traveled.[28]  This reimbursement rate "is based on an annual study of the fixed and variable costs of operating an automobile," including, for example, depreciation, insurance, repairs, tires, maintenance, gas, and oil.[29]  Plaintiff was not required to take time off work during this period because she was unemployed.  And Plaintiff does not claim that her transportation of L.L. denied her the opportunity to accept employment during the relevant time period.  Any other costs claimed by Plaintiff are far too speculative for the court to entertain on this appeal.[30]

---

[28] IRS, *Standard Mileage Rates for 2013*, http://www.irs.gov/uac/Newsroom/2013-Standard-Mileage-Rates-Up-1-Cent-per-Mile-for-Business,-Medical-and-Moving.

[29] *See, e.g.*, IRS, *Standard Mileage Rates for 2015*, http://www.irs.gov/uac/Newsroom/New-Standard-Mileage-Rates-Now-Available;-Business-Rate-to-Rise-in-2015.

[30] Defendant also contends that it could not have legally provided compensation to Plaintiff for any medical service she provided to L.L. under the Yuba County IEP.  Plaintiff admits that she seeks "reimbursement for her time spent providing related services for L.L., which included *qualified health care services*" (Doc. 45, at 15 ¶ 45) (emphasis added).  Plaintiff compares the services she was able to provide administering Diastat to those provided by a "private medical provider," such as a RN or LPN.  The practice of professional and practical nursing is defined

Second, the court rejects Plaintiff's argument that she is entitled to recover additional "costs" related to her temporary transportation of L.L. because Plaintiff saved Defendant from the necessity of incurring various expenses, including hiring a bus driver and medical support. (Doc. 45, at 29).  Plaintiff characterizes this claim as her attempt to recover for "replacement costs."  (*Id.*).  The replacement costs Plaintiff has identified are merely hypothetical expenses associated with Defendant's transportation of L.L. by a means other than reimbursing Plaintiff. But Plaintiff never had to bear these hypothetical "costs" in order to provide L.L. with transportation.  Therefore, Plaintiff has not shown that her actual and identifiable costs exceeded those contemplated by the IRS's standard mileage reimbursement rate.  What Plaintiff actually seeks is compensation.  She is entitled to costs, not wages.  The court concludes that Defendant did not deny Plaintiff a FAPE by offering her only the costs associated with transporting L.L. to and from the Burkett Center, and not the costs that Defendant would have had to pay an employee in her stead.

Plaintiff counters that a FAPE requires schools to reimburse parents not only for the out-of-pocket costs of the services that they provide for their eligible children, but also for their time and effort in providing those services.  Plaintiff's argument relies on *School Committee of the Town of Burlington, Massachusetts v. Department of Education of Massachusetts*, 471 U.S. 359 (1985), and two related lower court decisions.  *Hurry v. Jones*, 734 F.2d 879 (1st Cir. 1984); *Bucks County Department of Mental Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61 (3d Cir. 2004).  A brief review of the case law confirms the Hearing Officer's correctly concluded that Plaintiff's reliance on *Burlington*, *Hurry* and *Bucks County* is misplaced.

---

by statute to include administering medications and treatments prescribed or directed by authorized medical personnel for compensation.  Ala. Code § 34-21-1(3). Family members are exempt from the regulations and licensure requirements governing the profession only to the extent they administer medications and treatments "gratuitously." Ala. Code § 34-21-6.  Under Alabama law, Plaintiff likely could not have received Defendant's compensation for providing "nursing" services without violating criminal law. Ala. Code § 34-21-7.

In *Burlington*, the Supreme Court interpreted the provision of the IDEA's predecessor statute that mandated reviewing courts grant "appropriate" relief as conferring broad discretion on those courts, and stated that "the only possible interpretation is that the relief is to be 'appropriate' in light of the purpose of the Act." 471 U.S. at 370.  The Court held that reimbursing parents for expenses incurred by placing their child in private school is "appropriate" relief when a court has found that the public school placement was inappropriate and that the parents' private placement was appropriate.  *Id.*  Although the *Burlington* Court did not address whether a reimbursement in excess of a parent's out-of-pocket expenses was ever "appropriate" under the IDEA, in two instances, lower courts have concluded that it is.

In *Hurry*, the First Circuit addressed whether a child's parents were required to provide transportation when a district refused to do so.  734 F.2d at 883.  In that case, a school district discontinued door-to-door transportation for a disabled child after he grew too heavy for the bus driver to carry him up and down the steps of his home to his bus each day.  *Id.* at 881.  The district court concluded that this constituted a denial of related services in violation of the IDEA's predecessor statute.[31]  Thus, the district court had concluded that by refusing to transport the child, the school system had denied a FAPE.  In attempting to fashion "appropriate" relief, the district court decided that reimbursement should not be limited to out-of-pocket expenses. *Id.* at 883-84.

By the time the case reached the court of appeals, liability was not an issue in *Henry*.  *Id.* at 883.  The question was whether the district court correctly awarded damages.  Addressing the question of damages only, the First Circuit upheld the district court's award of compensation for the parent's time and effort because it concluded that the school's inappropriate discontinuation and denial of transportation services was "sufficiently compelling."  *Id.* at 884-85.  It reasoned

---

[31] The predecessor statute was the Education for All Handicapped Children Act of 1975.

that because the school system had refused to provide the service, the parents were faced with the options of hiring someone to transport the child or doing it themselves.  As the First Circuit reasoned:

> It is clear that if the Hurrys had hired a private agency to drive George to and from school, this expense would have been reimbursable under the EAHCA, just as the expense of placing George in a private school would have been reimbursable had the School Department wrongfully declined to provide him with an appropriate public education.  *Doe v. Brookline School Committee*, 722 F.2d at 919-21.  The fact that the Hurrys performed the service themselves rather than hiring someone else to perform it should not bar them from recovering the reasonable value of their time and effort.

*Id*. at 884.

Similarly, in *Bucks County*, the Third Circuit was faced with a school system's *refusal* to provide services.  The *Bucks County* court held that parents may seek reimbursement for their time and services, in addition to their out-of-pocket expenses, when a court "fashion[s] 'appropriate' relief."  379 F.3d at 69.

In *Bucks County*, a school district refused to provide Applied Behavior Analysis ("ABA") therapy to an eligible student.  The parents of the child stepped in to provide those services themselves.  *Id.* at 67.  The court concluded that the failure to provide ABA therapy to the child constituted a denial of a FAPE.  *Id.* at 67.  In order to reimburse the parents for their services, a hearing officer awarded the parents both their out-of-pocket expenses and money for their time and effort.  *Id.* at 64-65.  Relying on *Hurry*, the Third Circuit affirmed, noting that "[r]eimbursing parents for the time and services necessary for their child, *when there has been an IDEA violation*, is not unheard of."  *Id.* at 69 (emphasis added).  Accordingly, the court determined that limiting reimbursement to out-of-pocket expenses would give a narrow construction to the term "appropriate."  *Id.* at 69.  Importantly, the court's "reimbursement"

remedy was based upon the conclusion that the school system had violated the IDEA.  379 F.3d at 67.

Neither of these cases held that a school district's mere failure to agree to compensate parents' for their time and effort as part of an IEP (or in supplement of an IEP) constitutes a denial of a FAPE.  Rather, each case involved an instance where a school district in some other fashion denied an eligible child appropriate services (*i.e.*, a FAPE), and, in the aftermath of that violation, a court or hearing officer was required to fashion "appropriate" relief.  As already discussed in detail above, in this case, Defendant's offer of services was appropriate.  Defendant never discontinued or denied L.L.'s related transportation services.  Rather, Defendant agreed to provide L.L. transportation services and also agreed to reimburse all of Plaintiff's costs (in accordance with the Yuba County IEP and Alabama regulations implementing the statutory requirements of the IDEA) during a temporary period in which it sought to hire someone to provide the services.  There is simply no indication in this record, nor any assertion by Plaintiff, that the Yuba County IEP contemplated anything more than mileage reimbursement similar to that offered by Defendant.[32]  Furthermore, even if this court agreed with the conclusion reached in *Hurry* and *Bucks County* -- that a parent is entitled to the value of her time and effort in performing a service -- Plaintiff has not identified any actual cost associated with L.L.'s transportation that Defendant's standard reimbursement contract would not have covered.  Here, Plaintiff was temporarily transporting her child to school while Defendant sought to employ an individual to perform that service.  Because Plaintiff has not identified any IDEA violation, the Hearing Officer's determination that Defendant offered Plaintiff the free and appropriate related

---

[32] The court defers to the Hearing Officer's decision on the factual finding that the services offered were identical.  (R. 552-53).

service of transportation is due to be affirmed.[33]  Thus, it is simply unnecessary for the court to fashion any kind of relief here.[34]

In summary, the record reflects that Defendant complied with all of its obligations to Plaintiff under the IDEA.  The record does not reveal any procedural defect by Defendant, and, regardless, the record is clear that any such alleged defect certainly did not result in a denial of a FAPE.  Defendant offered to provide specialized transportation services to L.L. in conformity with her then-existing Yuba County IEP until Defendant could secure a nurse to provide the requested services (which occurred on October 24, 2015).  The court affirms the Hearing Officer's decision that the services provided under the Yuba County IEP were comparable to those offered by Defendant and that those services provided L.L. with a FAPE.

### B.      Plaintiff's Section 504 Claim Fails Because Defendant Did Not Deny Her Child a Full Day's Education

In addition to her IDEA appeal, Plaintiff asserts a claim under section 504 of the Rehabilitation Act.  In particular, Plaintiff alleges that Defendant discriminated against L.L. on account of her disability by failing to provide her with a full day of school.  (Doc. 1 at 19; *see also* Doc. 45 at 43).  Defendant has moved for summary judgment on this claim under Federal

---

[33] The court also pauses to note that there is some question as to whether Defendant could legally have provided Plaintiff, as Plaintiff requested, compensation for any medical service Plaintiff provided to L.L. under the Yuba County IEP.  Plaintiff admits that she seeks "reimbursement for her time spent providing related services for L.L., which included *qualified health care services*." (Doc. 45, at 15 ¶ 45) (emphasis added).  Plaintiff compares the services she was able to provide administering Diastat to those provided by a "private medical provider," such as a RN or LPN.  The practice of professional and practical nursing is defined by statute to include administering medications and treatments prescribed or directed by authorized medical personnel for compensation.  Ala. Code § 34-21-1(3). Family members are exempt from the regulations and licensure requirements governing the profession only to the extent they administer medications and treatments "gratuitously."  Ala. Code § 34-21-6.  Thus, under Alabama law, there remains a question as to whether providing Plaintiff with pay for performing "nursing" services would have violated Alabama Code § 34-21-7.  But that question is moot in light of this court's principal ruling in this case.

[34] This finding is also consistent with Plaintiff's expectations (reasonable and actual) at the time she re-enrolled with Defendant and her past experience.  Plaintiff operated under similar standard reimbursement arrangements at each of L.L.'s prior schools, including most recently at Birmingham City (R. 221-22), Jefferson County (R. 236-37), and Yuba County (R. 480).

Rule of Civil Procedure 56.  For the reasons outlined below, the court find that there are not genuine fact disputes related to this claim and concludes that Defendant is entitled to judgment as a matter of law.

Recognizing she is in a dubious posture by bringing a section 504 claim alongside an IDEA appeal,[35] Plaintiff contends summary judgment is appropriate as to her section 504 claims on the very narrow ground that Defendant has discriminated against L.L. on account of her disability by failing to provide her with a full day of school.

The Rehabilitation Act prohibits an entity which receives federal funding from discriminating against individuals with disabilities.  *See* 29 U.S.C. § 794(a).  Section 504 mandates, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  *Id.*  To prevail on a section 504 claim, an individual must show that (1) that she is a qualified individual with a disability; (2) that she was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.  *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).[36]  The first element is not contested here.  Instead, the issue is whether Plaintiff's inability to get her daughter to and from school on time means Defendant has discriminatory denied L.L.'s statutorily mandated services.

_____

[35] Defendant argues that "appropriateness" claims (like Plaintiff's) are not cognizable under either the Rehabilitation Act or the IDEA, but instead, are within the exclusive purview of the IDEA.  The court need not decide the propriety of Plaintiff asserting these claims here, however.  In any event, Defendant is entitled to summary judgment on the section 504 claim for other reasons.

[36] The standard for liability under the Rehabilitation Act is the same as that under the Americans with Disabilities Act ("ADA"); thus, ADA cases are precedent for Rehabilitation Act cases.  29 U.S.C. § 794(d); *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

As discussed above with respect to Plaintiff's IDEA claim, Defendant's offer of services in conformity with L.L.'s Yuba County IEP did not deny Plaintiff's access to a full day education; therefore, for these same reasons, the court concludes that Plaintiff cannot prove the second factor of the section 504 analysis as a matter of law.[37]   Accordingly, Plaintiff's section 504 claim is due to be dismissed.

## V.   Conclusion

For the reasons outlined above, Defendant's Motion (Doc. 42) is due to be granted, and Plaintiff's Motion (Doc. 44) is due to be denied.  The Hearing Officer's decision under the IDEA is due to be affirmed, and Defendant is entitled to summary judgment on Plaintiff's Rehabilitation Act claim.  Accordingly, Plaintiff's claims are due to be dismissed with prejudice.

A separate order will be entered in accordance with this Memorandum Opinion.

**DONE** and **ORDERED** this August 17, 2015.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE

---

[37] Generally, federal courts have held that where an IDEA claim is subject to dismissal, a section 504 claim based upon the same allegations is also due to be dismissed.  *See, e.g., Doe v. Arlington Cnty. Sch. Bd.*, 41 F. Supp. 2d 599, (E.D. Va. 1999); *Jones v. Washington Cnty. Bd. of Educ.*, 15 F. Supp. 2d 783, 787 (D. Md. 1998); *D.F. v. Western Sch. Corp.*, 921 F. Supp. 559, 573-74 (S.D. Ind. 1996); *Moubry v. Indep. Sch. Dist. 696*, 9 F. Supp. 2d 1086, 1112 (D. Minn. 1998); *Monticello Sch. Dist. No. 25 v. Ill. State Bd. of Educ.*, 910 F. Supp. 446, 449-50 (C.D. Ill. 1995), *aff'd*, 102 F.3d 895 (7th Cir. 1996); *Indep. Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (8th Cir. 1996); *Kerry M. v. Manhattan Sch. Dist. #114*, 2006 WL 2862118, at *9 (N.D. Ill. 2006); *N.L. ex rel. Mrs. C. v. Knox Cnty. Sch.*, 315 F.3d 688, 695-96 (6th Cir. 2003); *Tarah P. v. Board of Education of Fremont School District 79*, 1995 WL 66283, at *4 (N.D. Ill. 1995).  This legal principle provides still another basis for dismissal of Plaintiff's section 504 claim.